**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| ANNETTE SCOTT | CIVIL ACTION NO. 07-0487 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| WAL-MART STORES, INC. | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 27) filed by the defendant, Wal-Mart Louisiana, L.L.C. ("Wal-Mart"). Wal-Mart seeks summary judgment on each and every claim in the plaintiff's lawsuit, namely her claims of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). The plaintiff, Annette Scott ("Scott"), opposes the Motion for Summary Judgment. See Record Document 32. For the reasons which follow, the Motion for Summary Judgment is **GRANTED**.

**I.     BACKGROUND.**[1]

---

[1] Many of the facts set forth in Wal-Mart's "Statement of Undisputed Material Facts" went unchallenged by Scott. See Record Documents 27-3 & 32-3. Scott disputed other facts by alleging that the statement "misconstrues the facts as reflected in the record." Record Document 32-3. Yet, she failed to point to any evidence in the record to support her assertion that the facts had been misconstrued. As to other facts, she argues that "this statement . . . constitutes nothing more than heresay [sic]." Id. However, these challenged statements are supported by competent summary judgment evidence, such as depositions and sworn declarations, and/or are out of court statements offered for a non-hearsay purpose.
Local Rule 56.2 provides:

> Each copy of the papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule.

Scott was employed at Wal-Mart's Minden, Louisiana store beginning on March 16, 1984. See Record Document 27, Exhibit A (Declaration of Kay LaCasse), ¶ 5. During her employment, Scott worked as a cashier, sales associate, and a stocker. See id., Exhibit A, ¶ 6; Record Document 32-3 at 1. For the last several years of her employment, she worked as a cashier on the overnight shift. See Record Document 27, Exhibit A, ¶ 6; Record Document 1, ¶ 3. In March 2006, she was earning $14.16 per hour. See Record Document 1, ¶ 3.

Wal-Mart has an open door policy which encourages associates to report any and all concerns, including perceived discrimination, without fear of retaliation. See id., Exhibit A, ¶ 7; Exhibit A(1) (PD-27 Open Door Communications Policy). Associates are reminded of this Policy periodically. See id., Exhibit A, ¶ 8; Exhibit A(6) (Excerpt from 2005 Associate Guide); Exhibit A(5) (Letter Acknowledged by Scott 9/28/90). Scott contends that this practice "was not a consistent occurrence," as reflected by her last acknowledgment of the policy dated 9/28/90. See Record Document 32 at 1; Record Document 27, Exhibit A(5).

Wal-Mart uses a progressive discipline system. See Record Document 27, Exhibit A, ¶ 9; Exhibit A(2)(PD-30, Coaching for Improvement Policy). This system includes the following progressive steps: (1) verbal coaching; (2) written coaching; (3) Decision-Making Day ("D-day"); and (4) termination of employment. See id. Under the progressive discipline system, an associate given a written coaching is expected to provide a written

---

Scott has provided only bald objections and failed to cite specific summary judgment evidence to controvert Wal-Mart's statement of facts. It is not this Court's duty to perform that task for Scott. See Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). Thus, much of the Background Section of the instant Memorandum Ruling has been adopted from Wal-Mart's "Statement of Undisputed Material Facts." See Record Documents 27-3.

plan of action. See id., Exhibit A, ¶ 10; Exhibit A(2). Failure by the associate to provide such a plan could result in the associate receiving the next level of progressive discipline. See id. On D-day, the associate is given a day off work to decide whether he still wants to work for Wal-Mart, and, if so, to make a plan of action for meeting Wal-Mart's standards. See id., Exhibit B (Excerpts of Scott Deposition) at 48-50; Exhibit A, ¶ 11; Exhibit A(2). Pursuant to this system, any additional performance issues or policy infractions occurring within one year of a D-day will result in termination. See id., Exhibit A, ¶ 12; Exhibit A(2). Again, Scott contends that the progressive discipline system "was not a consistent occurrence." See Record Document 32 at 1-2.

Wal-Mart's attendance policy is available for associates to review on Wal-Mart's intranet. The policy specifically explains that Wal-Mart expects its attendance policy to be enforced through progressive discipline. See Record Document 27, Exhibit A, ¶ 13. The policy provides, in pertinent part:

> Approved absences are defined as:
>
> • Bereavement leave and emergency volunteer time.
> • Emergency situations (i.e. weather, medical emergencies).
> • Requested schedule changes that are approved by management one (1) day prior to the change, including leave of absence.

Id., Exhibit A(3) (PD-52, Attendance and Punctuality Policy) at 00834. The policy further provides that "three (3) unapproved tardies will equal one unapproved absence" and that "three (3) unapproved absences in a rolling six-(6) month period" will result in a coaching. See id., Exhibit A(3) at 00833-00835. The level of disciplinary consequences increases with each subsequent unapproved absence until the sixth unapproved absence in a six-month period, at which point the policy calls for termination. See id., Exhibit A, ¶ 13;

Exhibit A(3) at 00835. During her deposition, Scott specifically recalled the portion of the policy that calls for three unapproved tardies to be counted as one absence. See id., Exhibit B at 50-51.

The Minden store's attendance policy, which was distributed to all associates, is similar to the corporate policy, but used a points system to track unapproved absences. See Record Document 27, Exhibit A, ¶ 14; Exhibit A(4) (Minden Store Attendance Policy); Exhibit D (Excerpts of Tony Bauhaus Deposition) at 13-14. Specifically, the policy provides:

> Each associate will have 7 attendance points within a rolling 6 month period, toward which absences and tardies will accrue.

Id., Exhibit A(4). The policy also states that three unapproved tardies within three months count as one point. See id. The Minden store policy established a progressive disciplinary structure that involved verbal coachings, two written coachings, a D-day, and finally, termination upon accrual of seven points in a six month period. See id., Exhibit A, ¶ 14; Exhibit A(4); Exhibit D at 13-14. Once again, Scott maintains that routine policy and procedure updates regarding the Minden store's attendance policy were "not a consistent occurrence." Record Document 32-3 at 2. She argues that "this . . . is reflected by the fact that the last attendance policy reviewed with [her and signed by her] was in 2002." Id.

Under the Wal-Mart attendance policies, the validity of the reason for an associate's unapproved absence or tardiness is irrelevant, except to the extent the reason fell into one of the categories of "excused" absences. See Record Document 27, Exhibit D at 14, 27-28; Exhibit C (Excerpts of Scott Harnden Deposition) at 19-20, 41-42, 44-45. Thus, the validity of the reason for an associate's unapproved absence or tardiness did not impact whether the associate would be held accountable through the disciplinary structure. See

id.

The Minden store did not vigorously enforce the attendance policy under the management of Don Hines ("Hines"), previous Store Manager. The lax enforcement was even more liberal with the longer term associates such as Scott. See id., Exhibit A, ¶ 15; Exhibit D at 25; Exhibit E (Declaration of Richard Smelley), ¶ 3. On July 4, 2005, a new Store Manager, Scott Harnden ("Harnden"), began working at the Minden store. See id., Exhibit C at 8, 22. Harnden changed the way the store was run, as compared to Hines, his predecessor. See id., Exhibit B at 43-44; Exhibit C at 5; Exhibit D at 25.

After the beginning of 2006, Harnden began to focus on resolving the attendance issues at the Minden store. See id., Exhibit C at 27-29, 47-48, 52; Exhibit D at 25. In January 2006, he informed that associates and managers that he expected the attendance policy to be followed and enforced and that he would hold managers and supervisors accountable for not holding their associates accountable for poor attendance. See id., Exhibit A, ¶ 16; Exhibit C at 27-29, 45-48; Exhibit D at 25; Exhibit E, ¶ 4. During this same time period, attendance requirements were reviewed with associates at nearly every store meeting. See id., Exhibit A, ¶ 17; Exhibit B at 45-46; Exhibit D at 26-27; Exhibit C at 45-46.

Scott's attendance was a problem that was brought to her attention continually throughout her employment, specifically in her performance evaluations in 2006, 2004, 2002, 2001, 1998, and 1993. See id., Exhibit B at 100-102, 104-109; Exhibit B(1) (2006 Evaluation); Exhibit B(2) (2004 Evaluation); Exhibit B(3) (2002 Evaluation); Exhibit B(4) (2001 Evaluation); Exhibit B(5) (1998 Evaluation); Exhibit B(6) (1993 Evaluation); Exhibit A, ¶ 18. She became aware of the point system relating to absences and tardies over a rolling six month period no later than March 1, 2005, when she received a written coaching

regarding her poor attendance from Assistant Manager Rachel Fuller ("Fuller"). See id., Exhibit B at 65-66, 77-79, 119-120; Exhibit B(7) (March 1, 2005 Coaching Documentation). Scott later received a D-day on March 4, 2005, for refusing to sign the March 1st written coaching and for failing to submit an action plan. See id., Exhibit B at 122-124, 128-29; Exhibit B(8) (March 4, 2005 Decision-Making Day documentation). Thus, Wal-Mart's progressive discipline and attendance policies' structures called for termination of Scott's employment if she committed any policy infractions between March 4, 2005 and March 4, 2006. See id., Exhibit A(2); Exhibit A(3); Exhibit A(4); Exhibit C at 51.

Between April 2005 and February 2006, Tony Bauhaus ("Bauhaus"), a Night Assistant Manager, spoke to Scott about her absences and tardies several times, giving her many chances to improve that were not required by store policy. See id., Exhibit B, pp. 133-134. Exhibit D, pp. 9, 20-21. Exhibit E, ¶ 7. Scott was also included in approximately five group discussions regarding compliance with the Attendance/Punctuality Policy that Richard Smelley ("Smelley"), another Night Assistant Manager, conducted with all the overnight cashiers in 2006. See id., Exhibit B at 45-46; Exhibit E, ¶ 8. On February 22, 2006, Bauhaus presented Scott with her annual performance evaluation and advised her that she "need[ed] to work on attendance a lot." See id., Exhibit B(1). At the time of the evaluation, Scott had 26 absences and 29 tardies during the previous six months, which was rated "below expectations." See id., Exhibit D at 20-21, 28-29; Exhibit B(1); Exhibit B at 70-72. Scott's attendance records for March 2005 to March 2006 show that ten of the absences included in the 26 were the result of accumulation of unapproved tardies. See id., Exhibit A, ¶ 19; Exhibit A(7) (Associate Attendance Report for Scott).

After January 2006, the point at which Harnden had begun to focus his efforts on

attendance policy violations, Scott had unapproved absences on January 4, January 5, January 6, January 14, January 25, January 26, January 27, February 16, February 23, February 24, and February 28.  See id., Exhibit A, ¶ 20;  Exhibit A(7); Exhibit D, p. 30-31, 33.  Additionally, after January 1, 2006, Scott had unapproved tardies on January 12, January 13, January 18, and February 1.  See id., Exhibit A, ¶ 21; Exhibit A(7).

After Scott's unapproved absences on February 23rd and 24th, Smelley, Bauhaus, and Harnden discussed her situation, namely that she had many opportunities to improve her attendance; that she had received many warnings about her attendance; and that they viewed her absences and tardies as excessive in light of the policies and warnings.  See id., Exhibit C at 27-29, 51-52; Exhibit D at 20-22, 29; Exhibit E, ¶ 9.  Due to Scott's D-day on March 4, 2005, her continued violations of the attendance policy called for the termination of her employment.  Thus, after her unapproved absence on February 24th, Smelley, Bauhaus, and Harnden decided to discharge Scott from employment.  See id., Exhibit C at 27-29, 51-52; Exhibit D at 20-22, 29-30; Exhibit E, ¶ 10.  Bauhaus was given the task of advising Scott of the decision on February 28, 2006, but Scott did not report to work that night.  See id., Exhibit D at 29, 32-33; Exhibit E, ¶ 11; Exhibit C at 36.  When Scott reported to work on March 1st, Smelley advised her of the termination and presented her with an Exit Interview form describing the reason for her termination as "excessive absences and/or tardies" and "unapproved attendance and tardies."  See id., Exhibit E, ¶ 12;  Exhibit B at 81, 163-65; Exhibit B(10) (Exit Interview).

After the termination, Scott approached Harnden to "open door" the termination decision.  See id., Exhibit B, pp. 166-70; Exhibit C, pp. 29-31, 35.  He reviewed with Scott each of her unapproved absences and tardies during the past six months.  See id., Exhibit

C, pp. 29-31, 35, 49-50. His review revealed that during the six months prior to her termination, Scott had 27 unapproved absences, 29 unapproved tardies, and 1 unapproved "left earlys." Additionally, during the same time period, she had 9 approved absences, 16 approved tardies, and 19 approved "left earlys," which were not counted against her. See id., Exhibit C, pp. 50-51; Exhibit A(7).

During her open door session with Harnden, Scott attempted to present doctor's notes to justify her absences. These notes had never before been provided to Wal-Mart. Scott could not produce doctor's notes for all of the absences.² She also stated that she was absent because the computer had scheduled her to work on days she was not available, per the availability form she had submitted. Upon investigation, Harnden learned that in 2005, Scott approached management about changing her availability so that she would be off work Saturdays, Sundays and Mondays. This request was never approved by the Store Manager; therefore, the change request was never implemented in the store's computerized scheduling system.³ Ultimately, Harnden upheld Scott's March 1, 2006

---

²Scott underwent oral surgery, specifically a root canal, on February 23, 2006. See Record Document 1, ¶ 4. Her first opportunity to present the doctor's notes for her absences in relation to her root canal was on March 1, 2006. See Record Document 32-3, ¶ 41.

During his deposition, Harnden testified that medical emergencies under Wal-Mart's Attendance and Punctuality Policy include "an overnight stay in an emergency room" or an "emergency, admitted on an emergency or an overnight stay." See Record Document 27, Exhibit C at 42. Thus, under Wal-Mart's Attendance and Punctuality Policy, Scott's absence for a root canal, even with a doctor's note, was not an "approved absence." See id., Exhibit A(3) at 00834; Exhibit C at 42.

³The work schedules for associates are created by a computer program and then posted two weeks to a month in advance. Record Document 27, Exhibit B at 134-35. The schedules are based on scheduling availability forms provided by associates and approved by management. See id., Exhibit B at 135-137. A Store Manager must approve every associate's scheduling availability form. See id., Exhibit A, ¶ 22; Exhibit C at 31. If an associate notices an error in the posted schedule, it is that associate's responsibility to

termination. See id., Exhibit C, pp. 29-31, 35, 49-50; Exhibit A(7).

Scott invoked the review of the United States Equal Employment Opportunity Commission which issued her a Dismissal and Notice of Rights on December 12, 2006. See Record Document 1, ¶ 9; Record Document 1-2. On May 12, 2007, Scott filed a complaint before this Court alleging "that she was terminated based upon the deceitful employment practices of [Wal-Mart] and in violation of Title VII and the Age Discrimination in Employment Act." Record Document 1, ¶ 8. Wal-Mart filed the instant Motion for Summary Judgment on November 25, 2008, seeking dismissal of all of Scott's discrimination claims. See Record Document 27. Scott filed her opposition on December 10, 2008. See Record Document 32.

## II. LAW AND ANALYSIS.

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

report the error ahead of time. See id., Exhibit B at 135-136.

Scott submitted a scheduling availability form in September 2004 and marked herself unavailable to work on Saturdays, Sundays and Mondays. See id., Exhibit B at 141-42; Exhibit B(9) (September 2004 Availability Form). The September 2004 scheduling availability form submitted by Scott was never approved by the Store Manager or input into the computer scheduling system. See id., Exhibit A, ¶ 23. Nevertheless, Scott's work schedule was consistent with the availability form she submitted, and she was not scheduled on Saturdays, Sundays, and Mondays. See id., Exhibit B at 141-144. On one occasion, sometime in January or early February 2006, Smelley discussed with Scott her failure to report to work as scheduled and failure to call in advance to say she would be out. Scott recalls that the scheduled day was a Saturday, which was marked as unavailable on her scheduling availability form. This is the only time Scott is aware of having possibly been scheduled outside of her available time to work. See id., Exhibit B at 147-148, 151-153, 157, 158-162.

fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir. 2001). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Alton v. Tex. A&M Univ., 168 F.3d 196, 199 (5th Cir. 1999).

**B.     Race Discrimination.**

In paragraph 8 of her complaint, Scott alleges "that she was terminated based upon the deceitful employment practices of the Defendant and ***in violation of Title VII*** and the ADEA." Record Document 1, ¶ 8 (emphasis added). Yet, in her opposition to the Motion for Summary Judgment, Scott unequivocally stated that she is "not mak[ing] a claim for race discrimination under Title VII of the Civil Rights Act as represented by Defendant." Record Document 32 at 2. Regardless of whether Scott originally intended to assert a racial discrimination claim pursuant to Title VII, she has conceded that she is no longer pursuing such claim. Thus, the only claim before this Court is Scott's ADEA claim.

C. Age Discrimination.[4]

Pursuant to the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); Palasota v. Haggar Clothing Co., 342 F.3d 569, 574 (5th Cir. 2003). Here, Scott has produced no direct evidence of discrimination and must proceed according to the McDonnell-Douglas standard of proof. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). To establish a *prima facie* case of discrimination in violation the ADEA, Scott "must show that (1) [she] was discharged; (2) [she] was qualified for the position; (3) [she] was within the protected class at the time of discharge; and (4) [she] was either I) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age." Palasota, 342 F.3d at 575-576 (citation omitted). Once Scott has met this burden, Wal-Mart must articulate a legitimate, non-discriminatory reason for its decision to terminate her. See Berquist v. Washington Mut. Bank, 500 F.3d 344, 356 (5th Cir. 2007). If Wal-Mart meets this burden of production, then Scott "must then offer sufficient evidence to create a genuine issue of material fact either (1) that [Wal-Mart's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [Wal-Mart's] reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is [Scott's] protected characteristic (mixed-motive[s] alternative)." Id. at 356, citing Rachid v. Jack In The Box, Inc., 376 F.3d

---

[4] In her opposition, Scott argues that she is "not mak[ing] a claim for age discrimination in the traditional sense of the term" and contends that "she should not be required to present a *prima facie* case of age discrimination." Record Document 32 at 2, 4. Because she has provided no legal support for these arguments, which appear to have no basis in law, her requests are denied.

305, 312 (5th Cir.2004).

### 1. *Prima Facie* Case.

Scott easily meets the first two requirements of a *prima facie* case. She was terminated on March 1, 2006 and was qualified for her position as a cashier, sales associate, and/or stocker. There is some dispute as to the third requirement regarding whether Scott was over 40 years of age at the time of her termination. See Record Document 34 at 5 n. 13. However, for purposes of the instant Memorandum Ruling, the Court will assume that Scott was a member of the protected class at the time of her termination. Accordingly, her age discrimination claim hinges on the fourth requirement, whether she was replaced by someone outside the protected class; replaced by someone younger; or otherwise discharged because of her age.

In a work rule violation case such as the instant matter, Scott can satisfy this fourth element by establishing that she did not violate the rule or rules at issue or that, if she did, other employees outside of the protected class who engaged in similar acts were not punished similarly. See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995), citing Green v. Armstrong Rubber Co., 612 F.2d 967, 968 (5th Cir. 1980). The summary judgment record easily supports a finding that Scott violated not only the attendance and punctuality policy for the Minden store, but also the national corporate attendance and punctuality policy. Thus, in order to establish a *prima facie* case of discrimination, she must demonstrate, based on the summary judgment record, that employees outside the protected class were not punished similarly. In the Fifth Circuit, a plaintiff asserting a disparate treatment claim "must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is,

that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." Okoye v. Univ. of Tex. Houston Health Science Ctr., 245 F.3d 507, 514 (5th Cir. 2001) (internal quotations omitted); Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 221 (5th Cir. 2001) ("Or put another way, the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.").

In her deposition, Scott identified four associates as her comparators: Gayla (Shelly) Tucker ("Tucker"), Daphne Harville ("Harville"), Krystal Jones ("Jones"), and Kristal Lowery ("Lowery"). See Record Document 27, Exhibit B at 85-89, 200-204. Tucker was born in August 1959, meaning she was 46 years of age in March 2006. See id., Exhibit A, ¶ 24. Harville was born in December 1959, meaning she was 46 years of age in March 2006. See id., Exhibit A, ¶ 25. Jones was born in January 1984, meaning she was 22 years of age in March 2006. See id., Exhibit A, ¶ 26. Lowery was born in August 1982, meaning she was 23 years of age in March 2006. See id., Exhibit A, ¶ 27. Two of the comparators, Tucker and Harville, are not proper for comparison because they are members of the protected class, i.e., over 40 years of age. The two remaining comparators are Jones and Lowery.

Wal-Mart's employee records reveal that by March 1, 2006, Scott had accumulated twenty-nine "active," meaning they had been incurred during the previous six months, unapproved absences. See id., Exhibit A, ¶ 20; Exhibit A(7); Exhibit B at 70-72; Exhibit B(1); Exhibit D at 20-21, 30-31, 33. This number included the twenty-six unapproved absences noted on her February 22, 2006 performance evaluation and three additional

unapproved absences thereafter. See id. Scott also had an active D-day as of March 1, 2006. See id., Exhibits A(2)-A(4); Exhibit B at 122-124, 128-129; Exhibit B(8); Exhibit C at 51. When asked during his deposition how Scott's attendance compared to other associates, Harnden answered:

> Well, we have a report that prints out that basically tells the worst offenders to the lease offenders, and [Scott] was at the very tope of the list. She was the worst offender on the list in the entire store.

Id., Exhibit C at 52.

Scott's record must be compared to the records of Jones and Lowery. While these associates had attendance and punctuality issues that were the subject of counseling, their attendance problems were not as severe as Scott's. See id., Exhibit A, ¶ 28. As of August 2, 2006, Jones had accumulated four active unapproved tardies and received a verbal coaching, as she had no previous active coachings. See id., Exhibit A, ¶ 31; Exhibit A(11)(Documentation of Verbal Coaching given August 2, 2006 to Jones; Exhibits A(2)-A(4). As of February 28, 2006, Lowery had received a written coaching for an unapproved tardy, as she had a previous active verbal coaching. See id., Exhibit A, ¶ 32; Exhibit A(12) (Documentation of Written Coaching given February 28, 2006 to Lowery); Exhibits A(2)-A(4). Under Wal-Mart's progressive discipline policy, both Jones and Lowery were advanced one level of coaching for their unapproved tardies. Moreover, unlike Scott, neither Jones nor Lowery had an active D-day on their disciplinary record. Scott, Jones, and Lowery were all progressed to the next step in the progressive coaching structure; yet, Scott was the only associate for whom that next step was termination. There is simply no competent summary judgment evidence indicating that any associate at the Minden store had an attendance record as poor as Scott's. The record further reflects that Jones and

Lowery, the two appropriate comparators, were treated exactly as Scott for their attendance policy violations, namely that they were moved one step in the progressive discipline structure. Scott cannot establish that any similarly-situated associate was treated more favorably.

Scott has likewise failed to establish that she was otherwise discriminated against based on her age. Harnden and Smelley,[5] two of the decision-makers involved in the decision to terminate Scott, were over forty years old at the time of the decision. "When the decision-maker involved in employment decisions is also a member of a protected class, this fact creates another inference that the decision-maker did not make the adverse decision because of the plaintiff's protected class." Coblentz v. Glickman, 98-3645, 1999 WL 816266. *7 (E.D. La. Oct. 13, 1999), aff'd, 218 F.3d 743 (5th Cir. 2000) (citation omitted). Harnden's and Smelley's age undermines Scott's ability to demonstrate that she was otherwise discriminated against based on her age.

In her opposition, Scott argues "that it was the combined effect of her age, number of years with the company ad hourly wage that made her a prime target for termination." Record Document 32 at 4. With this argument, it appears that she is attempting to establish that she was "otherwise terminated based on her age, time with the company and wage." Id. at 5. Yet, without a citation to competent summary judgment evidence, there is simply no evidentiary support for Scott's bald assertion. See Littlefield, 268 F.3d at 282 (If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there

---

[5] Harnden was born in June 1965, making him 40 years of age in March 2006. See Record Document 27, Exhibit C at 5. Smelley was born in January 1958, making him 48 years of age in March 2006. See id., Exhibit E, ¶ 6.

is a genuine issue for trial.").

In closing, the Court finds that Scott has not established a genuine issue of material fact regarding whether she was treated differently than similarly-situated associates or otherwise discriminated against due to her age. Accordingly, Wal-Mart's Motion for Summary Judgment is granted and Scott's age discrimination claims are dismissed with prejudice.[6]

### III. CONCLUSION.

Based on the foregoing, the Court finds that Scott has failed to establish a *prima facie* case of discrimination. Accordingly, Wal-Mart's Motion for Summary Judgment is **GRANTED** and all of Scott's discrimination claims are **DISMISSED WITH PREJUDICE**.

A judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 12th day of February, 2009.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

---

[6]The summary judgment record establishes that Wal-Mart has satisfied its burden of articulating a legitimate, non-discriminatory reason, i.e., Scott's continual attendance and punctuality problems, for its decision to terminate Scott. See Record Document 27-2 at 8. However, because this Court has ruled that Scott cannot establish her *prima facie* case of age discrimination, it need not reach the issue of pretext or mixed motives.